# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

                                           Hon.  Arthur J. Tarnow

RONALD LABAN SEGARS,            Case No. 16-20222-3

      Defendant.

| | |
|---|---|
| ALDOUS BRANT COOK | Kimberly W. Stout (P38588) |
| Assistant United States Attorney | Kimberly W. Stout, PC |
| 411 W. Fort St, 20th FL | 370 E. Maple Rd., Third Floor |
| Detroit, Michigan 48226 | Birmingham, Michigan 48009 |
| *Attorney for the United States* | (248) 258-3181 |
| | *Attorney for Ronald Segars* |

## EMERGENCY MOTION FOR COMPASSIONATE RELEASE

Defendant Ronald Laban Segars (Segars"), through counsel, Kimberly W. Stout, moves this Court for an Order reducing his sentence and releasing him from prison under the compassionate release provisions of 18 U.S.C. § 3582, as modified by the First Step Act. Such an Order is warranted and just due to Segar's serious medical condition.

Pursuant to Local Rule 7.1, the undersigned sought concurrence on this motion by phone call, which was not yet been returned.

Segars requests that this Honorable Court grant his motion for compassionate release.

Respectfully Submitted,

Kimberly W. Stout, P.C.

/s/ Kimberly W. Stout
Kimberly W. Stout (P38588)
*Attorneys for Defendant*
370 E. Maple Rd., Third Floor
Birmingham, MI 48009
248-248-3181

Dated:  May 29, 2020

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

                                           Hon.  Arthur J. Tarnow

RONALD LABAN SEGARS,              Case No. 16-20222-3

     Defendant.

---

| | |
|---|---|
| ALDOUS BRANT COOK | Kimberly W. Stout (P38588) |
| Assistant United States Attorney | Kimberly W. Stout, PC |
| 211 W. Fort St, 20th FL | 370 E. Maple Rd., Third Floor |
| Detroit, Michigan 48226 | Birmingham, Michigan 48009 |
| *Attorney for the United States* | (248) 258-3181 |
| | *Attorney for Ronald Segars* |

---

## BRIEF IN SUPPORT OF EMERGENCY MOTION FOR COMPASSIONATE RELEASE

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**………………………………………………….…….v

**STATEMENT OF ISSUES**………………...………………………….………......…vii

**I.   INTRODUCTION AND FACTUAL BACKGROUND**…………..……….1

**II.   ARGUMENT**………………………………………………………….…….2

    **A.** THE GLOBAL HEALTH CRISIS CAUSED BY THE RAPID
       SPREAD OF COVID-19 WARRANTS A REDUCTION OF
       SEGARS'S   SENTENCE……………………………………….……..…2

      1.   The Administrative Exhaustion Requirement In 18 U.S.C. §
          3582(c)(1) Are Futile ………..……………………………………3

      2.   The COVID-19 Outbreak Presents A Compelling and Extraordinary
          Circumstance Which Necessitates Compassionate
          Release…………………………………………………………….……3

          a.   *Prisons Are "Tinderboxes For Infectious Disease"*………..4

          b.   *Segars's Underlying Health Conditions*…………………..12

      3.   A Sentence Reduction Is Consistent With The Sentencing
          Commission's Policy Statements And The Factors Outlined In 18
          U.S.C.S. § 3553(a)……………………………………………..18

          a.   *Policy Statements*………………………….…...………….18

          b.   *§ 3553(a) Factors*………………………………………….18

**III.   CONCLUSION**……………………………………………………………23

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*In re Manrique,* No. 19-mj-71055-MAG-1 (TSH), 2020 U.S. Dist. LEXIS 50017
(N.D. Cal. Mar. 19, 2020)…………………………………………...…………..…10

*United States v. Agomuoh*, No. 16-CR-20196 , U.S. Dist. LEXIS 86562 (E.D.Mich.
May 18, 2020)……………………………………………………………....….. 13

*United States v. Jamil*, No. 15-CR-00264-LHK-4, 2020 U.S. Dist. LEXIS 90507
(N.D. Cal. May 21,
2020)……………………………………………...……………………..….14

*United States v. Lucas*, No. 15-CR-143, 2020 U.S. Dist. LEXIS 75428 (W.D.N.Y.
Apr. 29,
2020)………………………………………………………...…………..14

*United States v. Martin,* No. 18-CR-834-7 (PAE), 2020 U.S. Dist. LEXIS 63451
(S.D.N.Y. Apr. 10, 2020)…………………………………………………12

*United States v. Nkanga*, No. 18-CR-713, 2020 U.S. Dist. LEXIS 56188 (S.D.N.Y.
Mar. 31, 2020)…………………………………………………………….…9, 10

*United States v. Paciullo*, No. 15-CR-834 (KMW), 2020 U.S. Dist. LEXIS 65198
(S.D.N.Y. Apr. 14, 2020)…………………………………………...……..…….3

*U.S. v Perez*, No. 17CR513-3 (AT), 2020 WL 1546422, at 2-3 (S.D.N.Y. April 1,
2020) …………………………………………………………………………..3

*United States v. Petrossi*, No. 1:17-CR-192, 2020 U.S. Dist. LEXIS 64972 (M.D.
Pa. Apr. 14,
2020)……………………………………………………………....……..2

*United States v. Pomante.* No. 19-20316, 2020 U.S. Dist. LEXIS 85626 (E.D.
Mich. May 15, 2020), at *15-17……………………………………………15, 16

*United States v. Rahim*, No. 16-20433, 2020 U.S. Dist. LEXIS 89355 (E.D. Mich.
May 21, 2020)…………………………………………………………….17

*United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718 (E.D. Pa. Apr. 1, 2020)…………………………………………..…...……17

*United States v. Skelos*, No. 15-CR-317 (KMW), 2020 U.S. Dist. LEXIS 64639 (S.D.N.Y. Apr. 12, 2020)…………………………………………………...……9

*United States v. Vo Duong Tran*, No. CR 08-00197-DOC, 2020 U.S. Dist. LEXIS 65414 (C.D. Cal. Apr. 10, 2020)…………………………………….………12

*Washington v Barr*, 925 F.3ʳᵈ 109, 118 (2ⁿᵈ Cir. 2019)…………………………….3

**Statutes and Rules**

18 U.S.C. § 3553(a)………………………………………..……………*passim*

18 U.S.C. § 3583…………………………………………………….………*passim*

## <u>STATEMENT OF ISSUES</u>

1.     Has Segars demonstrated a compelling and extraordinary circumstance warranting compassionate relief in light of his underlying health conditions, which heighten his risk of developing life-threating conditions should he contract COVID-19?

Defendant answers, yes.

2.     Has Segars demonstrated that a reduction in sentence would be consistent with the Section 3553(a) factors and policy statements issued by the Sentencing Commission, which require the Court to consider Segars's danger to society and other elements, when Segars has taken steps to effect a positive change while incarcerated?

Defendant answers, yes.

## I.     INTRODUCTION AND BACKGROUND

Mr. Segars pled guilty to Count One, Conspiracy to Distribute and to Possess with Intent to Distribute Heroin, and Count Six, Felon in Possession of a Firearm, pursuant to a Rule 11 Plea Agreement.  There was a mandatory minimum term of imprisonment of five years due to the amount of heroin attributed to the conspiracy. The Court subsequently sentenced Segars to 60 months imprisonment followed by 4 years of supervised release.

Segars is currently serving his sentence at FCI Morgantown in Morgantown, West Virginia.  Segars urgently moves this Court to grant his compassionate release.

Segars has been in in federal custody since March 15, 2018, and is scheduled to be released on June 14, 2022.  *See* **Exhibit A** (records). Segars has no disciplinary citations and is low risk for recidivism according to the Bureau of Prisons (BOP). *See* **Exhibit B** (records). He has served approximately one-half of his sentence.

Segars is 48 years old and has hypertension as stated in his Presentence Investigation Report and within his BOP medical records. *See* **Exhibit C** (medical records filed under seal by Probation). Because of his underlying health conditions, Segars is at high risk for developing severe health complications should he contract COVID-19 in FCI Morgantown. Accordingly, he now files this motion in accordance with 18 U.S.C. § 3582(c)(1)(A)(i) for his compassionate release.

This Court should grant such relief for the following reasons. First, the exhaustion requirement contained in Section 3582 should be waived as it is futile. Second, Segars asserts that the global health crisis, in combination with his underlying health conditions constitute compelling and extraordinary circumstances warranting his compassionate release because the conditions make him more susceptible to contracting a severe case of COVID-19. Third, a reduction in Segars's sentence would not be contrary to any of the factors outlined in Section 3553(a) and would be consistent with the Sentencing Commission's policy statement.

## II.   ARGUMENT

### A.   THE GLOBAL HEALTH CRISIS CAUSED BY THE RAPID SPREAD OF COVID-19 WARRANTS A REDUCTION OF SEGARS'S SENTENCE

Segars humbly moves this Court to reduce his sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act of 2018 ("FSA"). Prior to the passage of the FSA, only the Director of the Bureau of Prisons ("BOP") could move the court for compassionate release of a defendant. *United States v. Petrossi*, No. 1:17-CR-192, 2020 U.S. Dist. LEXIS 64972, at *8 (M.D. Pa. Apr. 14, 2020). However, the FSA now expressly permits a defendant to directly move the court under § 3582(c)(1)(A)(i). Under normal circumstances, a defendant may only seek such relief from a court if either (1) "the defendant has exhausted all administrative rights to appeal the BOP's failure to bring a motion on his behalf" or

(2) "thirty days have elapsed since requesting that the warden of his facility initiate such action." *United States v. Paciullo*, No. 15-CR-834 (KMW), 2020 U.S. Dist. LEXIS 65198, at *4 (S.D.N.Y. Apr. 14, 2020) (citing 18 U.S.C. § 3582(c)(1)(A)).

18 U.S.C. § 3582(c)(1)(A) states in pertinent part that:

> the court . . . may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent, they are applicable if it finds that . . . such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

It is undocumented whether Mr. Segars has exhausted his administrative remedies. However, he urges that this Court waive this provision as the Court did in its Order and Opinion, case number 16-20222, ECF 385, for co-Defendant Ronald Lee Miller. In its Order, this Court stated that it has the authority to do so citing *U.S. v Perez*, No. 17CR513-3 (AT), 2020 WL 1546422, at 2-3 (S.D.N.Y. April 1, 2020) and *Washington v Barr*, 925 F.3rd 109, 118 (2nd Cir. 2019). *See Opinion*, Pg. ID 2448-9. The bureaucracy and overwhelmed BOP as well as the need to avoid delay supports a waiver.

### 2.   The Covid-19 Outbreak Presents A Compelling and Extraordinary Circumstance Which Necessitates Compassionate Release.

We are living in extraordinary times as the COVID-19 pandemic sweeps the world. At the time of the writing of this motion, there are close to 5.8 million cases

worldwide and over 360,000 deaths.[1] In the United States alone, there are about 1.76

million cases with over 103,000 deaths and counting. [2]

### a. *Prisons are "Tinder Boxes for Infectious Disease"*[3]

Segars is currently housed at FCI Morgantown, in Morgantown, West

Virginia. Although the BOP is currently not reporting any confirmed cases of

COVID-19 within this prison, in *United States v. Amarrah*, No. 17-20464, 2020 U.S.

Dist. LEXIS 80396, 2020 WL 2220008 (E.D. Mich. May 7, 2020), the Court found

that zero *confirmed* COVID-19 cases is not the same thing as zero COVID-19 cases.

This pandemic has for the first time in our lifetimes placed entire states on

lock-down. A difference that exists for inmates versus the public, is that inmates

cannot practice social distancing, frequent hand washing, and limit exposure to other

humans as recommended by all in the medical field including the Center for Disease

Control (CDC). Resources such as soaps have always been limited in jails and

---

[1] World Health Organization, Coronavirus Disease 2019 (COVID-19) Situation Report – 87, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200416-sitrep-87-covid-19.pdf?sfvrsn=9523115a_2.

[2] Coronavirus Disease 2019 (COVID-19), Cases in the US https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

[9] *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718, at *2 (E.D. Pa. Apr. 1, 2020).

prisons and will restrict the necessary washing to prevent contracting the virus. And, inmates will continue to be housed in close contact with one another thus allowing the risk of the virus be carried through the air which the CDC is now advising is possible. The CDC is suggesting people wear masks. The conditions inherent in a prison setting are contrary to the recommendations of the U.S. Government for preventing the coronavirus. As Mr. Segars reported in his letter to this Court, he *will* be able to practice social distancing at home but not in prison. *See* **Exhibit D** (letter of Segars).

And, although there are no reported cases at Morgantown, there is reason to believe that such reporting does not accurately describe the state of infection within the facility because the BOP is not testing inmates on a large scale. Of the 146,000 inmates in BOP custody, only 2,700 of them have been tested (roughly 1.8%). Of those 2,700 inmates, 2,000 of them tested positive with a positive rate of 70 %. https://twitter.com/OfficialFBOP/status/1256207531820662785?s=20; https://www.nytimes.com/2020/05/03/opinion/andrea-circle-bear-coronavirus-prison.html.

A representative from the BOP confirmed herself that the reporting might not be accurate: "The goal of our reporting is to provide the public with **insight** as to the current status of our COVID-19 response at various facilities. As can be seen from various state websites, for example Maryland, reporting of cases while tied to

positive cases, does not necessarily account for unconfirmed (non-tested) cases." "The BOP has 122 facilities spread out across the country and is coordinating with local health departments in each when we identify confirmed positive cases as well as identify symptomatic inmates. With different jurisdictions implementing different testing protocols, and some inclined to forgo routine testing in order to manage limited testing resources as the COVID-19 outbreak continues, we do not plan at this time to provide those figures. I want to point out that any inmate who presents with COVID-19 symptoms will be isolated and treated per CDC guidance." https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#22c48cea7ba3.

Further, Monongalia County, where FCI Morgantown is located, is the fifth most infected county within West Virginia with 121 confirmed cases of the virus. Additionally, the county has allowed many businesses to reopen including salons, gyms, indoor dining at restaurant, indoor malls, and bars – meaning that another spike in cases may be on the horizon. https://www.monchd.org/covid-19.html. The relaxed restrictions also mean that BOP staff who travel in and out of the prison daily can now mingle with the public on their off time, and still have the opportunity to transmit the virus into the facility if it's not already there.

The CDC has also recognized that prisons are breeding grounds of infection due to the living conditions. *Interim Guidance on Management of Coronavirus*

*Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for

Disease Control (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-

ncov/community/correction-detention/guidance-correctional-detention.html.

"Correctional and detention facilities can include custody, housing, education,

recreation, healthcare, food service, and workplace components in a single physical

setting. The integration of these components presents unique challenges for control

of COVID-19 transmission among incarcerated/detained persons, staff, and

visitors." *Id.*

Moreover, there are many opportunities for COVID-19 to be introduced into

a correctional or detention facility, including daily staff ingress and egress; transfer

of incarcerated/detained persons between facilities and systems, to court

appearances, and to outside medical visits; and visits from family, legal

representatives, and other community members. Some settings, particularly jails and

detention centers, have high turnover, admitting new entrants daily who may have

been exposed to COVID-19 in the surrounding community or other regions. *Id.*

The virus is sweeping through prisons and a lawsuit has been filed by many

inmates at FCI Elkton.  In *Wilson v. Williams*, No. 4:20-cv-00794, 2020 U.S. Dist.

LEXIS 70674 (N.D. Ohio Apr. 22, 2020), a group of inmates at FCI Elkton brought

class action habeas proceeding seeking an injunction forcing FCI Elkton to submit

to the court a list of medically vulnerable "subclass members" and subsequently release them. The Court granted the injunction, limited the subclass to "those identified by the CDC as being at higher risk" which necessarily includes "all Elkton inmates 65 years or older and those with documented, pre-existing medical conditions, including heart, lung, kidney, and liver conditions, diabetes, conditions causing a person to be immunocompromised (including, but not limited to cancer treatment, transplants, HIV or AIDS, or the use of immune weakening medications), and severe obesity (body mass index of 40 or higher)." At*15. The Court ordered the prison to evaluate each subclass member's eligibility for transfer out of FCI Elkton through any means – compassionate release, parole, transfer furlough.

In the *Williams* case, it is stated that it is unlikely that the figures represent the actual number of cases at the institution, given the paltry number of tests the federal government has made available for the testing of Elkton's inmates. At *4-5. To date, Elkton has received only 50 COVID-19 swab tests and one Abbott Rapid testing machine with 25 rapid tests. Most swab tests have already been used. Because the Department of Justice has given BOP so few tests, Elkton medical staff has needed to triage test usage. At *5. Respondents represent that "test swabs are back-ordered until July or August," but they "believe that they will receive an additional 25 rapid test[s]" each week. These additional tests are all but useless considering Elkton's 2,400 inmates. At *5. Everything suggests that if BOP tested as ODRC

commendably has, results would show that the virus has become equally widespread within Elkton. However, without testing there is no way to know how many Elkton inmates have the virus. At *5. The Ohio prisons virus response undercuts BOP's ability to argue that testing is either unavailable or is impossible. Why has the Justice Department allocated Elkton an entirely insignificant number of tests while Ohio has been able to pull off mass testing across not only Marion, but at multiple institutions? At *5. While the COVID-19 tests inadequacy is one area of grave concern, testing is only one part of the multi-faceted approach institutions like Elkton must take to reduce the virus's spread. At *5.

The Sixth Circuit denied immediate review.

While states like Michigan lock-down to protect their citizens, inmates cannot be isolated and the BOP does not have the ability to practice any of the hygienic and social distancing techniques that the CDC recommends to prevent rapid transmission of COVID-19. Incarcerated individuals have limited or no access to products to sanitize their own environment, and cannot practice social distancing or even control their exposure to large groups. Accordingly, "jail and prisons are powder kegs for infection" and "[r]ealistically the best—perhaps the only—way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible." *United States v. Skelos*, No. 15-CR-317 (KMW), 2020 U.S. Dist. LEXIS 64639, at *4 (S.D.N.Y. Apr. 12, 2020) (quoting

*United States v. Nkanga*, No. 18-CR-713, 2020 U.S. Dist. LEXIS 56188, at *1 (S.D.N.Y. Mar. 31, 2020)).

To slow the spread of COVID-19, the BOP has instructed its facilities to implement new practices like screening inmates for symptoms. But at least one court has highlighted the inherently problematic nature of such instruction – noting that "the [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . We don't know who's infected." *In re Manrique,* No. 19-mj-71055-MAG-1 (TSH), 2020 U.S. Dist. LEXIS 50017, at *1 (N.D. Cal. Mar. 19, 2020). In fact, Attorney General William Barr even acknowledged the shortcomings of the BOP's preventative measures, stating that "[w]hile BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions."[4]

As an additional COVID-19 measure, on April 1 the BOP mandated a facility wide lockdown which was extended until May 18.[5] On April 1, only 57 inmates and

---

[4]*See* supra, note 1.

[5] Federal Inmates in Sheridan Are Finding Coronavirus Lockdown 'Overwhelming,' Public Defender Says, https://www.oregonlive.com/coronavirus /2020/04/ors-federal-public-defender-lockdown-at-federal-prison-to-avoid-spread-of-coronavirus-is-becoming-overwhelming-for-some-inmates.html

37 BOP staff members had contracted COVID-19.[6] However, the presence of COVID-19 in prisons has continued to grow at an alarming rate, with the BOP reporting in April that 473 inmates and 286 staff members within its facilities have tested positive and 18 inmates have died.[7] However, its being reported that the BOP is under-reporting. Forbes.com/*Bureau of Prisons Underreporting COVID-19 Outbreaks in Prison*, Apr 1, 2020. Today, the BOP reports 64 inmates have died from COVID-19. COVID-19 Cases, BOP, https://www.bop.gov.coronavirus, (visited May 29, 2020).

The union representing BOP guards across the country recently filed a lawsuit. In an Imminent Danger complaint filed with the Occupational Safety and Health Administration, BOP guards alleged that the agency has

> authorized movement of infected inmates, inmates suspected of being infected, inmates who have been in close contact or proximity to infected inmates, areas of the Country that do not have any rate of infections, or to Institutions that otherwise have not shown signs of any introduction of the virus, thus introducing the virus into an uninfected area.

OSHA Complaint.

---

[6] *See* Congressional Research Service, *Federal Prisoners and COVID-19: Background and Authorities to Grant Release* at 1. https://crsreports.congress.gov/product/pdf/R/R46297

[7] COVID-19 Cases, https://www.bop.gov/coronavirus/ (last visited Apr. 17, 2020).

While prison staff, commendably, continue to report to work they do so with the potential to spread the lethal virus unwittingly. Inmates like Segars, although in lock-down, still touch phones, computers, and showers that other inmates are using. However, inmates are not provided soap and can only purchase sanitizing products in commissary. Inmates who are sick are not tested. Reports have also noted that a lock-down on its own may not prevent the spread of COVID-19 even if inmates are housed in individual cells – because they "typically share the same ventilation system with prisoners in other cells."[8] Even with the BOP's precautionary measures, the bottom line is that "individuals housed within our prison systems nonetheless remain particularly vulnerable to infection." *United States v. Vo Duong Tran*, No. CR 08-00197-DOC, 2020 U.S. Dist. LEXIS 65414, at *5-6 (C.D. Cal. Apr. 10, 2020). *See also United States v. Martin,* No. 18-CR-834-7 (PAE), 2020 U.S. Dist. LEXIS 63451, at *7 (S.D.N.Y. Apr. 10, 2020) ("The crowded nature of federal detention centers . . . present an outsize risk that the COVID-19 contagion, once it gains entry, will spread.").

### b.   *Segars's Underlying Health Conditions*

*Segars is even more at risk than the general population at FCI Morgantown for catastrophic health consequences should he contract COVID-19. Segars is 48 years old and has Hypertension, among other conditions, suffering a stroke before*

---

[8] *See* Congressional Research Service, *supra* note 13, at 3.

*entering prison, thereby delaying his entry by 3 months as he recovered at Sinai-Grace Hospital. See* ECF 317. His sealed medical records are replete with references to his high blood pressure/hypertension condition and medications.

Federal district courts have been granting compassionate release motions based on a movant's heightened risk of infection by COVID-19. In *United States v. Agomuoh*, a 69-year-old at Morgantown inmate was released. He had many health conditions including diabetes, hyperlipidemia, hypertensive heart disease without failure, and atherosclerotic heart disease. The 69-year-old had served 9 months of a 60-month sentence for health care fraud. The Court by Judge Levy of this District, stated that although there are currently no confirmed cases of COVID-19 at FCI Morgantown, it is not clear whether the facility is conducting widespread COVID-19 tests for inmates or staff. An inmate within FCI Morgantown reported that he had "been transferred within the prison and now has a new roommate. They're sleeping within ten feet of each other. They're eating elbow to elbow . . .. There's no medical treatment after 5:00 PM. He would have to wait until the next day. There's usually—he reports only one doctor on staff with a handful of nurses for the population of I believe almost 700." *Id.* at *7. The Court noted that this statement was not challenged by the government.

"As to FCI Morgantown's lack of confirmed COVID-19 cases, the Court accords no weight to this statistic without evidence that FCI Morgantown has

13

implemented a universal testing regimen." To the contrary, the lack of any confirmed testing at FCI Morgantown "aggravates [the Court's] concerns about Defendant's likelihood to contract COVID-19 while in federal custody." *Id.* at *24.

As West Virginia lawmakers recently urged in a petition to the Bureau of Prisons, increased testing is necessary to contain the otherwise rapid and often asymptomatic spread of this disease. *See* Basil John, *West Virginia lawmakers press the Bureau of Prisons for more COVID-19 testing*, (May 14, 2020) https://www.wwlp.com/news/west-virginia-lawmakers-press-the-bureau-of-prisons-for-more-covid-19-testing/"

In *United States v. Jamil*, No. 15-CR-00264-LHK-4, 2020 U.S. Dist. LEXIS 90507 (N.D. Cal. May 21, 2020), the Court by Judge Koh out of California, released a 60 year old at Morgantown with diabetes, high cholesterol, and hypertension who was serving a sentence for conspiracy to traffic in counterfeit goods, and conspiracy to commit criminal copyright infringement. He served 34 of his 84 -month sentence when he was released. The Court found that "the realities of incarceration prevent imprisoned defendants from engaging in practices that reduce the risk of contracting COVID-19." *Id.* at *6.

In *United States v. Lucas*, No. 15-CR-143, 2020 U.S. Dist. LEXIS 75428 (W.D.N.Y. Apr. 29, 2020), the Court by Judge Vildardo out of New York, released an inmate at Morgantown who was serving time for a drug charge and had diabetes.

14

"Lucas's motion for release asserts that FCI Morgantown does not provide masks to the inmates and that the conditions there make the social distancing required to minimize the risk of contracting COVID-19 nearly impossible. That is not surprising given the challenges social distancing presents in a prison or any facility with many residents." *Id.* at \*8.

Further, a 69 year old with chronic kidney disease, hypertension, obesity, and diabetes was released by this Court's Chief Judge. He had served only 2 months out a 12 month sentence for wire fraud. "Even if the Court were to accept the argument that the BOP and FCI Morgantown are taking precautions to ensure the safety of prisoners, Defendant's risk of contracting COVID-19 is not speculative. Until the BOP increases its testing capacity, a lack of confirmed cases has very little bearing on the amount of actual cases in a federal prison. *See* Sadie Gurman, *More Than 70% of Inmates Tested in Federal Prisons Have Coronavirus*, The Wall Street Journal (Apr. 30, 2020), https://www.wsj.com/articles/more-than-70-of-inmates-tested-in-federalprisons-have-coronavirus-11588252023 (explaining that the BOP expects confirmed cases to increase as it increases testing)." *See United States v. Pomante.* No. 19-20316, 2020 U.S. Dist. LEXIS 85626 (E.D. Mich. May 15, 2020), at \*16.

Chief Judge Page Hood continued and stated that "as of May 14, 2020, there were 114 confirmed cases of COVID-19 in Monongalia County—the county

where [*10] FCI Morgantown is located. *See* COVID-19, monchd.org, https://www.monchd.org/covid-19.html. The Court notes that absent zero cases in Monongalia County the prison is still at risk of exposing inmates. *See* Pien Huang, *What We Know About the Silent Spreaders of COVID-19*, NPR (Apr. 13, 2020, 4:43 PM), https://www.npr.org/sections/goatsandsoda/2020/04/13/831883560/can-a-coronavirus-patient-who-isnt-showing-symptoms-infect-others (explaining that people without symptoms can—and have—spread the virus). Presumably, many of FCI Morgantown's staff live in Monongalia County and may have been exposed to COVID-19." "As for the Government's argument that FCI Morgantown currently has zero confirmed cases of COVID-19, the Court is not persuaded that a lack of confirmed cases is a compelling reason not to grant relief if a defendant otherwise qualifies." Although there are currently no confirmed cases, as an inmate at FCI Morgantown, Defendant may have already been exposed to COVID-19." *United States v. Pomante.* No. 19-20316, 2020 U.S. Dist. LEXIS 85626 (E.D. Mich. May 15, 2020), at *15-17.

Defendant Doshi, a 64-year-old held at FCI Morgantown was released. This Court stated: "The Government has responded that the facility where Doshi is held, FCI Morgantown, has zero confirmed cases of COVID-19. This fact is meaningless, however, for there is no evidence of how many inmates have been

tested." *United States v. Doshi*, No. 13-cr-20349, 2020 U.S. Dist. LEXIS 88539E.D. Mich. May 20, 2020

In *United States v. Rahim*, No. 16-20433, 2020 U.S. Dist. LEXIS 89355 (E.D. Mich. May 21, 2020), having just started to serve his 72-month sentence in January of 2019, Judge Edmunds released 67-year-old Rahim incarcerated for charges related to a kick back scheme. Rahim has COPD, diabetes, hypertension, congestive heart failure and "The Court recognizes and acknowledges the Government's [*9] argument that FCI Morgantown currently has zero confirmed cases of COVID-19. But the Court is not persuaded that a lack confirmed cases alone is a compelling reason not to grant relief if a defendant otherwise qualifies"

In *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718, at *24 (E.D. Pa. Apr. 1, 2020), the Pennsylvania Court granted compassionate release to an inmate at FCI Elton who had diabetes, high blood pressure, and liver abnormalities. He was 17 years into a 20 year sentence. The Court noted that "[t]he situation at FCI Elton in particular is alarming. The first cases of COVID-19 appeared there *after* the government assured the Court that the BOP was taking aggressive action to contain the disease. Elton is filled to capacity and appears to have few tests. Mr. Rodriguez represents that inmates at Elton do not have adequate soap or disinfectant, are still housed together in large groups, and

share a thermometer without sanitization, against critical public health recommendations." At *24.

Such cases illustrate that although various health conditions can be generally manageable, like hypertension, the COVID-19 crisis has turned health conditions potentially deadly.

> **3.    A Sentence Reduction Is Also Consistent with the Sentencing Commission's Policy Statements and the Factors Outlined in 18 U.S.C.S. § 3553(a).**

In addition to finding a compelling and extraordinary circumstance warranting compassionate relief, a court considering a defendant's motion under Section 3582(c)(1)(A) of 18 United States Code, must decide whether a sentence reduction would "be consistent with the applicable policy statements issued by the Sentencing Commission" and supported by the "factors set forth in section 3553(a)." § 3582(c)(1)(A).

> **a.    *Policy Statements***

Section 3582(c)(1)(A) is accompanied by a policy statement and commentary promulgated by the Sentencing Commission. The relevant section states that a court may reduce a sentence for "extraordinary and compelling reasons," including situations where an individual is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide

self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(1)(A).

As already stated, Segars has an increased risk for developing life-threatening conditions should he contract COVID-19 due to hypertension. If infected with a severe or debilitating case of COVID-19, Segars will certainly have a difficult time recovering and/or caring for himself. Accordingly, the defendant urges this Court to find that "the risk of serious illness or death he faces in prison" qualifies as an extraordinary or compelling reason, favoring his early release. *United States v. Sawicz,* No. 08-cr-287 (ARR), 2020 U.S. Dist. LEXIS 64418 (E.D.N.Y. Apr. 10, 2020) at 7. The Court should keep in mind the stroke Segars suffered in 2017.

### b. § 3553(a) Factors

Similarly, the application of the § 3553(a) factors mitigates towards Segars's compassionate release. In considering what is "sufficient but not greater than necessary, to comply with the purposes of [sentencing]", § 3553(a) instructs a court to consider the following:

> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> **(2)** the need for the sentence imposed—
>
>> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> **(B)** to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) [the kinds of sentence and sentencing range provided for in the USSG]

(5) any pertinent [Sentencing Commission policy statement]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense

*Sawicz*, 2020 U.S. Dist. LEXIS 64418 at 7, 8 (summarizing § 3553(a)).

## DISPARITY (18 U.S.C. 3553(a)(6))

U.S. Probation suggested the following levels of culpability of the twelve (12)

defendants in the conspiracy in its Presentence Investigation Report (PSI).

### Leaders

Ronald Lee Miller
Ramel Levertis Howard

### Mid-Level Culpability

Ronald Laban Segars
Jeffrey Eugene Snell
Keith Nettles
Terry Charles McDaniel
Jeffrey Moore

20

**Couriers**

Richard Lamont Harris
Elliot Sanford Cotton
Joe Brown Moore
Anthony Williams Miller
Giovanni Morris

The sentences of the co-Defendants were as follows:

Ronald Lee Miller – 72 months (now released)

Ramil Levertis Howard – 60 months (now released)

SEGARS – 60 months

Jeffrey Eugene Snell - 60 months

Keith Nettles – Case Dismissed

Terry Charles McDaniels – 36 months

Jeffrey Moore – 1 day

Richard Lamont Harris – 30 months

Elliott Sanford Cotton – 60 months

Joe Brown Moore – 60 months

Anthony Williams Miller – 20 months

Giovanni Morris - Unknown

In order to avoid disparity, and in view of the compassionate release of 2 co-Defendants, also with compromised health, Segars should be released.

## HISTORY (18 U.S.C. 3553(a)(1))

Both of Defendant's parents were addicted to drugs.  Segars was put in a position to revive his mother from overdoses on three (3) occasions.  Jamal Segars, Segars's only full brother, was murdered in 2004.

Segars has three adult children.  He is currently married to the mother of two of his children, but they are estranged.  His estranged wife left him with the two children in his care for many years due to her drug problem.  Segars reported to probation that he never intended to sell drugs, but rather, was always struggling to make a living.  He stated that "…the best thing I ever did was making sure my children stay on the straight and narrow, and always know right from wrong.  My life was messed up with two parents who got high off heroin all day."  *See* Presentence Report pg. 13.

Defendant has had employment history including recording producer.  He owned and operated Walla Records and produced CD's for several rappers including Fuze-Da Big Shot. He is now working as a window washer at FCI Morgantown.

Currently, the Defendant has a stable home with his fiancé who he hopes to marry someday.  He receives income from a rental home and his fiancé is a seamstress.  As stated in Segars's letter, his fiancé will support him.

22

## DANGER TO COMMUNITY (19 U.S.C. 3553(a)(2)(C)

Segars acknowledges the serious nature of the crimes he committed which landed him behind bars. However, he chose to plead guilty to his crimes and accepted responsibility. He has no disciplinary record whatsoever in prison and the BOP has determined he is not likely to be a recidivist. See **Exhibit B.** Plus, he has taken numerous classes to better himself, including small business management, real estate, and home renovation. *See* **Exhibit E**. He currently washes windows at the prison. **Exhibit F**. If this Court were to grant his Motion, he could return to his fiancé and children and would not be a danger to society. *See* **Exhibit D.**

## III.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant requests that this Honorable Court enter an order reducing his sentence and granting compassionate release.

Respectfully Submitted,

Date: May 29, 2020            KIMBERLY W. STOUT, P.C.

<u>/s/ Kimberly W. Stout</u>
Kimberly W. Stout (P38588)
*Attorney for Defendants*
370 E. Maple Rd., Third Floor
Birmingham, MI 48009

**PROOF OF SERVICE**

I hereby certify that on May 29, 2020, I electronically
filed the foregoing paper with the Clerk of the Court
using the ECF system which will send notification of
such filing to counsel of record.

/s/ Kimberly W. Stout
KIMBERLY W. STOUT (P38588)
*Attorney for Defendants*
370 E. Maple Rd., Third Floor
Birmingham, MI 48009
248-258-3181