UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

     Plaintiff,

                            Case No. 16-20222

v.                               Hon. Arthur J. Tarnow

RONALD SEGARS,

     Defendant.

_____/

## United States' Response Opposing
## the Defendant's Motion for Compassionate Release

The Defendant, Ronald Segars, was involved in the delivery and distribution of heroin from a drug trafficking organization to other distributors working in the Detroit, Michigan area. His participation in the drug trafficking organization allowed it to more effectively move and distribute a large amount of dangerous drugs throughout the Detroit area. In addition to committing this serious offense, Segars has a criminal history that includes another felony drug offense and multiple felony weapons offenses, and upon a search of his residence in this matter was found to be in possession of two firearms, including an assault-style rifle. Segars was charged with multiple drug and firearms

1

offenses, and pled guilty to conspiracy to distribute heroin, in violation of 21 U.S.C. §§ 841 and 846, and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). On December 21, 2017, he was sentenced to 60 months' of imprisonment.

Segars began serving his current sentence on March 15, 2018. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of May 29, 2020, these directives have already resulted in at least 3,531 inmates being placed on home confinement. *See* BOP Covid-19 Website.

*Second*, Segars does not qualify for compassionate release. On May 7, 2020, Segars submitted an administrative request for compassionate release based on his purported risk of a severe case of Covid-19, but because 30 days have not yet passed, as required under 18 U.S.C. § 3582(c)(1)(A), the Court does not yet have jurisdiction to address his Covid-19-based argument until he exhausts his administrative remedies. Nor, in any event, does Segars satisfy the statutorily mandated criteria for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Segar's failure to meet the criteria in USSG § 1B1.13 also forecloses relief. Even assuming a defendant facing a heightened risk from Covid-19 might satisfy the criteria in § 1B1.13(1)(A) & cmt. n.1, Segars does not have a condition that places him at higher risk from Covid-19. And BOP's efforts at containing the spread of Covid-19 have succeeded as of the date of this filing in there being no confirmed cases of the disease at FCI Morgantown, where

Segars is incarcerated. Additionally, Segars' offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2), because he is a repeat drug offender who has consistently armed himself with multiple firearms despite the illegality of so doing. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release because for these same reasons.

## Background

Beginning in 2012, Ronald Miller organized a group of individuals to assist in the receipt and distribution of cocaine. As the organization continued its activities through the next several years, the receipt and distribution of large quantities of heroin became part of its business. In order for the organization to effectively store and distribute its heroin, it relied upon individuals to report to various safe houses where drugs were stored, and deliver the drugs to other individuals who then packaged and sold it at user level amounts. During the investigation into the Miller drug trafficking organization, the DEA obtained Court-authorized approval for telephone intercepts, and in June 2014 intercepted calls between Segars and Ronald Miller (his father)

discussing delivering "samples" of heroin to drug customers, as well as the quality of the heroin in the organization's possession. Further investigation established that Segars regularly transported drugs from stash houses to customers. On July 1, 2014, a consent search was done of Segars' residence in Detroit, and a loaded GP WASR-10163 39mm assault-style rifle, as well as a loaded 9mm pistol, were recovered. Due to prior felony convictions for drug trafficking and weapons possession, Segars was prohibited from possessing those firearms.

Segars was charged with multiple drug and weapons crimes. He eventually pled guilty to conspiracy to distribute heroin and being a felon in possession of firearms. He was sentenced to the mandatory minimum term of 60 months' of imprisonment on December 21, 2017.

Segars began serving his prison sentence on March 15, 2018, and is currently incarcerated at FCI Morgantown in West Virginia. He is 48 years old, and his projected release date is June 14, 2022. His only underlying medical conditions of note are essential hypertension and a history of a stroke, from which he has recovered. Nevertheless, Segars has moved for compassionate release, citing his hypertension, a history of a stroke, and the Covid-19 pandemic.

## Argument

### I.  The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

#### A.  The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *See id.* Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are also issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits

are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times. Efforts like these have so far succeeded in there being no confirmed cases of Covid-19 at FCI Morgantown where Segars is incarcerated.

**B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant

home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 3,531 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau

9

of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. And if a prisoner would be unlikely to take release conditions or Covid-

19 precautions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of

law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny Segars' motion for compassionate release.

Segars' motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG

13

§ 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. The Court is barred from granting release because Segars has not exhausted his administrative remedies.

The Court must dismiss Segars' motion, because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020).

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016). As the Sixth Circuit has explained, there is a "sharp divide" that "separates statutory from prudential exhaustion." *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019). Unlike judicially crafted requirements, statutory requirements may not be excused, even to account for "special circumstances." *Ross*, 136 S. Ct. at 1856–57.

Section 3582(c)(1)(A) is likely even a *jurisdictional* bar on the Court's authority to consider a motion for compassionate release. The Sixth Circuit has labeled § 3582(c)'s limitations "jurisdiction[al]." *Williams*,

15

607 F.3d at 1125. The statute "speak[s] to the power of the court rather than to the rights or obligations of the parties." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994). And it delineates "when, and under what conditions," a court may exercise its "'adjudicatory authority.'" *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005)). But even if § 3582(c)'s requirements were not considered truly jurisdictional, they would still be mandatory claim-processing rules that must be enforced when a party "properly rais[es]" them. *Eberhart*, 546 U.S. at 19 (2005). Thus, regardless of how it is labeled, § 3582(c)(1)(A)'s exhaustion requirement is mandatory. *See Ross*, 136 S. Ct. at 1856–57; *United States v. Marshall*, 954 F.3d 823, 826–29 (6th Cir. 2020).

The only court of appeals to address this question has agreed. In *United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020), the Third Circuit held that the Covid-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s exhaustion requirement. Rather, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.* at 597.

16

The majority of district courts to decide this question nationwide, including many in our district, have similarly held that a "failure to exhaust" under § 3582(c)(1)(A) "cannot be excused, even in light of the Covid-19 pandemic." *United States v. Alam*, No. 15-20351, 2020 WL 1703881, at *2–*3 (E.D. Mich. Apr. 8, 2020); *accord United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *2 (E.D. Mich. May 15, 2020); *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Mathews*, No. 14-CR-20427-02, 2020 WL 1873360, at *2–*3 (E.D. Mich. Apr. 15, 2020). As one of the those district judges has explained, the few courts that have excused exhaustion under § 3582(c)(1)(A) have mistakenly relied on cases addressing *judge-made* exhaustion requirements, not *statutory* exhaustion requirements. *Mathews*, 2020 WL 1873360, at *2–*3.

Congress's reasons for § 3582(c)(1)(A)'s exhaustion requirement apply with even greater force during the Covid-19 pandemic. The Bureau of Prisons is already responding to the pandemic—not just through heightened safety measures, but by evaluating its entire prison population for home confinement. By requiring a defendant to exhaust, § 3582(c)(1)(A) gives the Bureau of Prisons the opportunity to gather his

17

medical documentation and other records, evaluate his request, and decide in the first instance whether it justifies either compassionate release or some other form of relief. As the Third Circuit observed: "Given BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 954 F.3d at 597.

Segars has not yet exhausted his administrative remedies. It has not been 30 days since his request to the Warden made on May 7, 2020, nor have his administrative options been fully exhausted. Segars has therefore not satisfied § 3582(c)(1)(A)'s mandatory exhaustion requirement.

### B. There are no extraordinary and compelling reasons to grant Segars compassionate release.

Even if Segars had exhausted his administrative remedies, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well as developing "the criteria to be applied and a

18

list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

19

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Segars and other inmates. Thus, as the Third Circuit has explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. And there

20

are no confirmed cases where Segars is incarcerated, FCI Morgantown, and so any risk of contraction is attenuated.

Segars' age and medical condition likewise do not satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even when considered in combination with the Covid-19 pandemic. The Centers for Disease Control publishes guidance for what demographic and medical criteria may put one at risk of a severe case of Covid-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. A review of Segars' medical records shows that he has not been diagnosed with *any* of these recognized risk factors for a severe case of Covid-19. *See* Exhibit 1, Medical Records (sealed), pg. 20 ("Health Problems"). And Segars is 48 years old, far younger than the age of 65 noted by the CDC as the age at which an individual's risk of a severe case of Covid-19 is particularly heightened. So whether considered alone or in combination with the Covid-19 pandemic, Segars' age and medical condition do not satisfy the initial eligibility criteria for release under USSG § 1B1.13 cmt. n.1. *See United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5–*6 (E.D. Mich. May 15, 2020).

21

In his letter to the Court requesting compassionate release, Segars pointed to his medical condition of hypertension and that he had previously suffered a stroke, claiming that these conditions placed him into "a high risk category for death, according to the CDC." (Dkt. # 415: Segars' Letter). That claim is not accurate. First, though Segars did, indeed, have what is characterized in medical records as a "mini stroke" in 2018 leading to paresis (mild paralysis or muscle weakness)[1] on the right side of his body, as of April 2020 he is able to walk without aid of a cane. (Exhibit 1, Medical Records, pg. 1). And having had such a stroke is not noted as a Covid-19 risk factor by the CDC.

Second, the form of hypertension with which Segars is diagnosed is likewise not recognized as a risk factor. Segars has been diagnosed with "essential (primary) hypertension." (Exhibit 1, Medical Records, pg. 20). This form of hypertension refers to systemic high blood pressure throughout the body. https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/symptoms-causes/syc-20373410. As many as 1 in 2 American adults has hypertension. https://millionhearts.hhs.gov/data-reports/hypertension-

---

[1] See https://www.healthline.com/health/paresis#definition

prevalence.html. Recent research suggests that, while hypertension is often present in patients with severe COVID-19 symptoms, "there is as yet no evidence that hypertension is related to outcomes of COVID-19." (*Hypertension and COVID-19*, American Journal of Hypertension, April 6, 2020, https://academic.oup.com/ajh/article/doi/10.1093/ajh/hpaa057/5816609). The CDC has not noted hypertension as a risk factor for a severe case of Covid-19.

In contrast, pulmonary hypertension is classified as a "serious heart condition" that may put one at higher risk of a severe case of Covid-19. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#serious-heart-conditions. Pulmonary hypertension is a particular form of high blood pressure in the heart-to-lung system, and is different than systemic high blood pressure. https://www.heart.org/en/health-topics/high-blood-pressure/the-facts-about-high-blood-pressure/pulmonary-hypertension-high-blood-pressure-in-the-heart-to-lung-system.

This distinction, between pulmonary hypertension on the one hand, and essential primary hypertension on the other, matters. One is a

recognized risk factor for a severe case of Covid-19, and the other is not. There is no evidence that Segars has been diagnosed with pulmonary hypertension. Segars medical condition is not the kind of "extraordinary or compelling" condition that merits compassionate release. *See United States v. Hull*, 2020 WL 2475639, *2-*3 (D.Conn. May, 13, 2020)(denying compassionate release for a prisoner with essential primary hypertension, but not pulmonary hypertension).

Finally, even if the combination of Segars' medical conditions and the Covid-19 pandemic satisfied the initial criteria for eligibility in USSG § 1B1.13 cmt. n.1, Segars would remain ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010). An evaluation of dangerousness under § 3142(g) also requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Segars' release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Segars is a repeat offender, who has consistently armed himself while trafficking drugs. He has proven that he is not amenable to deterrence, and there is little reason to believe that he will abide by the law if released.

Segars is not eligible for compassionate release.

### C.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not

entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Segars eligible for compassionate release, the § 3553(a) factors should still disqualify him for the reasons noted above: he is a danger, who has consistently proven that he is not amenable to deterrence. His continued offenses have involved weapons, including multiple weapons in the instant offenses.

### III.  If the Court were to grant Segars' motion, it should stay the release order pending any appeal by the United States.

If the Court were inclined to grant Segars' motion, despite the government's arguments above, the government would request that the

Court's release order include two provisions. First, the Court should order that he be subjected to a 14-day quarantine before release. Second, the Court should stay its order pending any appeal by the government to the Sixth Circuit. More specifically, the government would request that if the government files a notice of appeal before the 14-day quarantine ends, the Court's order would automatically be stayed through the completion of any appeal proceedings.

## Conclusion

Segars' motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/ Brant Cook
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9756
brant.cook@usdoj.gov

Dated: May 29, 2020

## Certificate of Service

I certify that on May 29, 2020, I electronically filed the foregoing document with the Clerk of the Court for the Eastern District of Michigan using the ECF system, which will send notification of the filing to all users of record.

s/ Brant Cook
Assistant U.S. Attorney
